North Side Deposit Bank *v.* Urban Redevelopment Authority of Pittsburgh.

Argued October 20, 1970, before President Judge BOWMAN, and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MANDERINO, MENCER and BARBIERI.

*William W. Milnes,* with him *Brandt, McManus, Brandt and Malone,* for appellant.

*Thomas H. Welsh,* with him *William G. Sutter, Jr.,* and *Metz, Cook, Hanna and Kelly,* for appellee.

OPINION BY JUDGE BARBIERI, February 22, 1971:

This is an appeal by the North Side Deposit Bank (Condemnee) from an order of the lower court dismissing its motion for a new trial.

Acting under its power of eminent domain pursuant to the Act of June 22, 1964 (Special Session) P. L. 84, 26 P.S. §1-101 *et seq.* (Supp. 1970), the Urban Redevelopment Authority of Pittsburgh (Condemnor) appropriated an eight-story building owned by the Condemnee. The first two floors and mezzanine contained Condemnee's banking facilities and offices. The upper six floors were rented offices.

The Condemnor filed a Declaration of Taking on May 5, 1966 and a Petition for Appointment of Viewers on June 6, 1966. The report of the Board of Viewers was filed on June 19, 1968, awarding Condemnee $445,000 plus moving expenses. On July 11, 1968, the Condemnee appealed to the Common Pleas Court of Allegheny County. The case was heard by a judge sitting with a jury. The trial resulted in a verdict of $400,000,

plus $5400 moving expenses for machinery, equipment and fixtures not forming part of the real estate, and $499 moving expenses for personal property. Condemnee's motion for a new trial, heard by a court *en banc,* was dismissed on December 10, 1969. This appeal followed.

Appellant Condemnee has briefed and argued three grounds for the granting of a new trial: (1) that Condemnor's expert Arnheim violated the "unit rule" by adding to his own valuation of the land and buildings at $330,000, the valuation of the machinery and equipment allegedly part of the real estate at $42,530 fixed by another of Condemnor's witnesses, Bailey, to arrive at his opinion of the fair market value of the whole property of $372,000; (2) that the "comparable sales" chart offered by Condemnor was erroneously accepted into evidence because it contained sales that were so remote in time from the date of the taking and otherwise not comparable to Condemnee's property that they should have been excluded from the jury's consideration as being not "judicially comparable"; and (3) that the trial judge erred in failing to charge the jury, as requested by Condemnee, that the fair market value of the property included items of machinery, equipment and fixtures which were necessary to the operation of the bank, if they were placed therein for permanent use (the Assembled Economic Unit Doctrine). We will consider these contentions in the order in which they have been presented.

## 1. The "Unit Rule" as to Expert Testimony

Condemnee's first contention is that Condemnor's witness Arnheim was erroneously permitted to testify as to damages in violation of the so-called "unit rule". Condemnee failed to object to the testimony when it was offered during the trial, but did ask for an in-

struction that Arnheim's testimony be disregarded because violative of the unit rule. Whether or not this request preserved this evidentiary question for review by us, we conclude that Condemnee's unit rule argument must be rejected because, at least as applied to the facts of this case, the unit rule has been abrogated by the enactment of the new Eminent Domain Code in 1964. Arnheim's allegedly improper testimony was that he arrived at his total valuation of $372,000 by adding a figure of $42,000—the value of the machinery and equipment purportedly attached to the real estate as testified to by Condemnor's other expert, Bailey—to Arnheim's own figure of $332,000 for the land and building. The Supreme Court cases on point indicate that this testimony might well be in violation of the unit rule. The Court in *Spiwak v. Allegheny County,* 366 Pa. 145, 147, 77 A. 2d 97, 98 (1950) said: "Plaintiff's attorney, on cross-examination, attempted to have [defendant's] witnesses break down [their] figures [on the value of the entire property before and after the taking] and place a value on the building as distinct from the lot prior to the improvement and upon each separately as affected by the improvement . . . [T]he proper method of determining the measure of damages sustained in condemnation proceedings is to obtain the difference in the market value of the tract as a whole before the taking and afterwards as affected by it and not by the addition of the separate values of each item constituting the property."

The rationale for the rule, at least insofar as it applies to the addition of the value of the land and building to the value of the machinery and equipment forming part of the real estate, is that the values of the parts do not necessarily equal the value of the whole. See *Berkley v. City of Jeannette,* 373 Pa. 376, 96 A. 2d 118 (1953). It seems to us, however, that the unit

rule is not a necessary conclusion from the standpoints of theory or practice. First, it is not necessarily true that the values of the parts will never equal the value of the whole. In those instances where it might be misleading for a witness to add separate values, opposing counsel on cross-examination could show the fallaciousness of this approach by bringing out the value of comparable properties sold as a unit. Secondly, the unit rule is at odds with the practice of real estate appraising. Land and building experts are often not qualified to evaluate machinery and equipment. Machinery and equipment experts are often not qualified to evaluate land and buildings. Real estate appraisers often break down the value of a property into a value of the land and the value of the building for purposes of tax assessment. It seems unwarrantedly presumptuous for a court to dictate proper procedures to a profession when cross-examination is available to test the competence of the expert witness and the strength of his opinions. Real estate experts as well as courts realize that the values of the parts do not necessarily equal the value of the whole. As long as the ultimate opinions of such expert witnesses fix the difference between the value of the property as a whole before the taking and the value of the property as a whole after the taking, we can see nothing necessarily misleading about allocating certain values to the land, building, and machinery and equipment forming part of the real estate.

While we would hesitate to depart from precedent merely because we question the rule's rationale, we believe that the new Eminent Domain Code overturned the unit rule holdings of such cases as *Spiwak,* supra, because the Legislature found them mandated by neither theory nor practice. Although the Code specifically abrogates the unit rule only insofar as the rule would prohibit use of the reproduction cost approach (see

§705(2)(iv)),[1] it more generally abolishes the unit rule in §705(1). §705(1) reads: "A qualified valuation expert may, on direct or cross-examination, state any or all facts and data which he considered in arriving at his opinion, whether or not he has personal knowledge thereof, and his statement of such facts and data and the sources of his information shall be subject to impeachment and rebuttal". This section on its face permits the expert to testify to "any or all facts and data which he considered in arriving at his opinion". If the expert considered certain breakdowns of the total valuation in arriving at his opinion, it would seem that these breakdowns would qualify as "facts and data" and thus be admissible. The comments of the Joint State Government Commission lend credence to this reading. The Commission notes that the primary purpose of §705(1) "is to change and broaden existing law which unduly limits the examination and cross-examination of an expert witness." The Commission cites *McSorley v. Avalon Borough School District*, 291 Pa. 252, 139 A. 848 (1927) as an unduly limiting case.

---

[1] Section 705(2)(iv) provides: "(2) A qualified valuation expert may testify on direct or cross-examination as to . . . (iv) The value of the land together with the cost of replacing or reproducing the existing improvements thereon less depreciation or obsolescence." 26 P.S. §1-705(2)(iv). This clause by itself lends support to our view that the unit rule has been abrogated. For in the situation where the expert relies *only* on the reproduction cost approach, application of the unit rule would apparently prohibit the witness from breaking down his ultimate opinion of a property's value even though he was permitted to break down the identical value in his testimony on the reproduction method. Such an anomalous result was probably not intended by the Legislature. See Snitzer, *Pennsylvania Eminent Domain* §705(2)(iv)-4 (1965). It would be no less anomalous to allow an expert who relied only on the reproduction cost method to break down his ultimate opinion while not allowing a witness who relied partially or totally on other methods to break down *his* ultimate opinion.

*McSorley* contained a statement of the unit rule and a prohibition of the reproduction cost approach. As *McSorley* was also cited in the comment to the clause which specifically endorsed the reproduction cost method (§705(2)(iv)), we believe the reference to *McSorley* in the comment to §705(1) may well reflect the Commission's dissatisfaction with the unit rule *in toto.* A comment to another clause states that the change to existing law "is intended to take cognizance of and permit testimony of all modern appraisal methods." Comment, §705(2). We believe that the Legislature intended the unit rule holdings of *McSorley,* supra, and *Spiwak,* supra, to be overturned because inconsistent with "modern appraisal methods."[2]

We do not mean to imply that such cases as *Gilleland v. New York State Natural Gas Corp.,* 399 Pa. 181, 159 A. 2d 673 (1960) and *Werner v. Commonwealth, Department of Highways,* 432 Pa. 280, 247 A. 2d 444 (1968) are affected by the new code. These cases are not unit rule cases in that they are not concerned with allocation of damages but rather with what items can be looked to in determining damages. In *Gilleland,* the Court held that a property must be valued as a whole in its present condition and not as speculatively divided into lots. In the case before us, Condemnor's witness Arnheim did not purport to testify to what the value of the bank property would be if the property were put to a different use or were sold part by part. He was rather testifying to the present value of the property as a unit. His breakdown of the figures did not indicate that he was valuing the machinery and equipment as if severed from the building. In *Werner,* the Court

---

[2] The Superior Court in *Thompson v. Commonwealth, Department of Highways,* 214 Pa. Superior Ct. 329, 257 A. 2d 639 (1969) took the contrary view because it felt that the Legislature had not been sufficiently explicit to warrant overturning the unit rule.

held that it was permissible to testify to the amount of subsurface coal lost through the condemnation but not directly to the value of the coal itself. There the Court was concerned that the cost of removing the coal was so speculative that it would be impossible to determine with precision how much the subsurface coal would enhance the value of the land. In our case there is no removal problem. Bank-office building was considered by both parties to be the highest and best use of the land. The hypothetical willing and informed buyer would thus not wish to remove the building and machinery before putting the land to its highest and best use.

## 2. Comparable Sales

The second of Condemnee's arguments is that the trial court erred in admitting Condemnor's evidence on "comparable sales" because several of the sales were too remote in time and so were not "judicially comparable". A witness for the Condemnor introduced the sales price, estimated annual income, and floor space of fifteen buildings in Pittsburgh. §705(2)(i) of the Code allows an expert witness to testify to the "price and other terms of any sale or contract to sell the condemned property or comparable property made within a reasonable time before or after the date of condemnation". Principally, Condemnee urges that the trial court committed an error of law in admitting testimony on the sales of two buildings in 1947 because of the sales not being "made within a reasonable time" of the condemnation. The trial court in ruling that the list of sales was admissible gave two grounds during trial for its ruling: (1) "that this is evidence that may be helpful to a jury in making a judgment as to the worth of the testimony and specifically so in light of the testimony . . . of this witness that there has been

no substantial change over a period going back twenty years or so;" and (2) "[but even if not admissible on the first ground] it is competent in the sense it is so remote, it is of no value to the Jury in fixing its opinion as to the fair market value of this property on the date of condemnation but to make an intelligent judgment on the worth of the testimony of this witness . . .". If the first ground can be taken to mean that the list of comparable sales was admitted because considered relevant to the value of the condemned property, the judge's ruling would be correct. The Supreme Court in *Gottus v. Allegheny County Redevelopment Authority*, 425 Pa. 584, 590, 229 A. 2d 869, 873 (1967), said: "We cannot say that the trial court abused its discretion when the expert witnesses state that the properties were comparable and that prices in real estate had remained substantially constant over a period of years in the immediate vicinity." However, if the judge meant in his first ground what he explicitly stated for his second ground—that the testimony was relevant *only* to enable the jury to judge the expertise of a witness—then the judge could be said to have decided that the sale was not comparable.

But no matter which way the judge's first ground for admitting the list is read, his second ground makes clear that he had not made a definite decision on comparability but rather thought that even incomparable sales should be allowed before a jury. Such a view is not in accord with the Supreme Court's view. The Court in *Commonwealth v. 108.3 Acres of Land*, 431 Pa. 341, 344-345, 246 A. 2d 124, 125 (1968) held that the sale of a property forty miles distant from the condemned property was not "judicially comparable" and should not have been admitted by the lower court because possibly confusing to the jury. The Court said that trial courts were not relieved of their "responsi-

bility of controlling the admission of valuation evidence" by the enactment of Section 705(2). The second rationale used by the trial court in admitting the fifteen sales would have admitted *any* sales and leave the decision as to whether or not they were comparable to the jury.

In its opinion *sur* Condemnee's motion for a new trial, the court *en banc* said that the list of sales was admissible because all of the sales were judicially comparable and because even if not judicially comparable, the sales did not mislead the jury because they were used as part of a ratio which purportedly fluctuates only narrowly over time. The opinion of the court *en banc,* even if it were logically sound, could not excuse the trial court for failing to meet its responsibility of deciding whether sales are judicially comparable or not before admitting them.

### 3. The Assembled Economic Unit Doctrine

At the conclusion of the trial, Condemnee's points for charge included the following request which was refused: "You must consider in determining the value of plaintiff's property, the land, buildings, together with the machinery, equipment and fixtures which were necessary to the operation of the bank and which were placed therein for permanent use, irrespective of whether they were physically attached to the realty." We believe that the trial judge's failure to so charge was such basic error that a new trial must be ordered. Condemnee's request was for instructions authorized by the Supreme Court's decision in *Gottus,* supra, which extended the valuation principles of the Assembled Industrial Plant Doctrine to eminent domain cases.

The verdict in the instant case was rendered on February 17, 1969. The opinion of the court *en banc*

below sustaining the trial judge's refusal to instruct the jury as authorized by *Gottus* and dismissing Condemnee's motion for new trial was filed on December 10, 1969. On January 30, 1970, the Supreme Court's decision, opinion by Mr. Justice EAGEN, was filed in the case of *Singer v. Oil City Redevelopment Authority*, 437 Pa. 55, 261 A. 2d 594 (1970). We have concluded that the *Singer* decision is applicable to our consideration of the issues in this case.

In *Singer*, the Supreme Court, referring to *Gottus* and considering the import of certain provisions of the Eminent Domain Code of 1964,[3] stated: "[T]here seems no logical justification for preserving the economic position of industrial plants while giving no such protection to commercial, service and other economic units." At 437 Pa. 64, 65. The Court then held that the principles of the Assembled Industrial Plant Doctrine would be applied generally to all commercial enterprises, within certain guidelines laid down by Mr. Justice EAGEN. The new valuation procedure is known as "The Assembled Economic Unit Doctrine". The Court in *Singer* finds that the Doctrine is necessary because the Code does not provide criteria for determining "when machinery, equipment and fixtures are part of the real estate and when merely personal property." At 437 Pa. 61. The opinion enumerates examples illustrating when the Code did not sufficiently define "just compensation".[4] The Court holds that the Doctrine's applicability depends on whether or not "all or most of the machinery, equipment and fixtures of the economic unit are removable without significant injury to them, such that the economic unit is suspectible of continu-

---

[3] Act of June 22, 1964 (Special Session) P. L. 84, 26 P.S. 1-101 et seq. See *Singer, supra* at 61-64.

[4] Sections 601 and 602 of the Eminent Domain Code, 26 P.S. §§1-601, 1-602.

ance, *as a comparable economic unit,* in a new location, . . .". At 437 Pa. 65-66. When relocation of a business as a unit can take place, however, the Doctrine is not necessary to provide "just compensation", since this is provided for by Section 608 (removal expenses for machinery, equipment and fixtures *not* forming part of the realty), Section 610 (moving expenses for personal property other than machinery, equipment and fixtures), and Section 609 (damages due to business dislocation).

In discussing the applicability of the Doctrine to the grocery store in *Singer,* the Court held that grocery stores in general could be treated in terms of the Assembled Economic Unit Doctrine but that Mr. Singer's grocery store did not meet either of two tests laid down by the Court for the determination of applicability. If grocery stores generically come within the scope of the Assembled Economic Unit Doctrine, there is no apparent reason why banks (or bank-office buildings), under proper circumstances, should not also come within the Doctrine's purview. And since the Code includes tenants within its definition of "Condemnee",[5] there is no apparent reason why the Doctrine should not apply to an economic unit such as a bank which occupies only a portion of a condemned property.

The facts as they are developed in such further proceedings as are held in this case will form the basis for determinations as to the applicability of either or both of the *Singer* tests. One of the tests (dealing with what is in the building) is that "when such a portion of the assembled economic unit is not removable from the condemned property that that which is so removable will not constitute a comparable economic unit in a new location, then *all* machinery, equipment, and fixtures, whether loose or attached, which are vital to the

---

[5] See §201(2), 26 P.S. §1-201(2), and comment thereto.

economic unit and a permanent installation therein, will be considered a part of the realty under the Assembled Economic Unit Doctrine . . .". At 437 Pa. 66, 67. (Emphasis in original) The other test (dealing with the nature of the building itself) is that "when the nature of the business requires a unique building for its operation, such that no other building within a reasonable distance is adaptable to the functioning of the business, then the condemned building, itself, will be considered an essential part of any meaningful economic unit in this industry". At 437 Pa. 67.

Order reversed. A new trial is ordered.

The foregoing opinion was prepared by Judge (now Justice) ALEXANDER F. BARBIERI before his resignation as a judge of the Commonwealth Court. It is hereby adopted as the opinion of the Court.