Redevelopment Authority of the City of Erie, Appellant, *v.* Achilles C. Pulakos and Pulakos, Inc., Appellees.

252

Argued November 6, 1974, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

John M. Quinn and Caroll F. Purdy, with them Quinn, Gent, Buseck & Leemhuis, Inc. and Metzger, Hafer, Keefer, Thomas & Wood, for appellant.

John M. Wolford, with him William R. Brown and MacDonald, Illig, Jones & Britton, for appellees.

OPINION BY JUDGE KRAMER, January 14, 1975:

This is an appeal filed by the Redevelopment Authority of the City of Erie (Condemnor) from an order of the Court of Common Pleas of Erie County dated October 30, 1973, denying the Condemnor's motion for a new trial, and the entering of judgment on a jury verdict in favor of Achilles C. Pulakos (Condemnee) against the Condemnor in the amount of $399,100 arising out of the condemnation of property. Although it is tempting to accept in toto the excellent opinion of the court below, we believe it will be beneficial to all concerned to file this more definitive opinion because of the importance of the issues involved.

This case had its genesis when the City Planning Commission of the City of Erie, by resolution dated October 30, 1962, certified a portion of the City's downtown section as a blighted area, and set out on a course of urban development. The Condemnee's property, known as 926 State Street, was located within the blighted area. This building had been used by the Condemnee and his immediate family for about 60 years for the retail and wholesale sale of candy, for the manufacture of ice

cream, candies and related products, and as a soda fountain-restaurant. The Condemnee's ancestors had commenced the candy business in Philadelphia circa 1889 before moving to Erie in 1903. The subject building had been acquired by the Condemnee's grandfather in 1916, and, shortly thereafter, had been gutted and rebuilt for the various business usages mentioned hereinbefore.

On June 8, 1968, the Condemnor filed its declaration of taking. It should be noted here the Condemnee filed preliminary objections contesting the validity of the Condemnor's acquisition, but they were overruled by the lower court in a prior non-related action, and eventually an appeal to the Pennsylvania Supreme Court was denied on procedural grounds. *See Erie Redevelopment Authority v. Pulakos,* 439 Pa. 157, 267 A. 2d 873 (1970), cert. denied 400 U.S. 991 (1971). The Condemnor obtained possession of the subject property on February 12, 1971.

Prior to January 1961, the Condemnee used the building on the property in the combined manufacturing and sales business described above. The first floor of the building was utilized for retail sales of candy, ice cream and bakery products, as well as a combined soda fountain-restaurant and kitchen. In January of 1961, while the Condemnee was in the process of remodeling his soda fountain-restaurant and kitchen, he was advised by certain named officials of the Condemnor "to hold down expenses" because of a possible condemnation by the Condemnor. As a result, the Condemnee stopped remodeling and did not reopen his restaurant and soda fountain. The Condemnee did, however, continue the manufacture and sale of candy and related products.

Because the ownership of the property has been raised as an issue by the Condemnor, we set forth that the record discloses beyond doubt that title to all of the real property and all of the machinery and equipment contained within the condemned building was in the name of Achilles C. Pulakos. The record also indicates

that for business or tax reasons Pulakos organized a Pennsylvania corporation known as Pulakos, Inc. which operated the various businesses and utilized the building, machinery and equipment in those businesses. Although the Condemnee did not specifically set forth in his testimony the ownership of Pulakos, Inc., he did set forth in his verified petition for the appointment of viewers that "99%" of that corporation is owned by Achilles C. Pulakos. Furthermore, throughout this long record there are many statements made by Condemnor's counsel, its witnesses and others, whereby there can be no doubt that everyone concerned with this case, including the trial judge, assumed from the evidence that Pulakos, Inc. and Achilles C. Pulakos are one and the same. This point will become important later in this opinion.

The condemned lot is approximately 20 feet wide and 147 feet long. The building thereon had a finished basement and three floors, totaling 11,807.52 square feet. The building contained custom-made and installed facilities, machinery and equipment including specialized cooling equipment, air-conditioning equipment, equipment to control temperature and humidity, assembly line equipment, cooling tunnels, ovens, ventilating equipment, dumb waiters, a freight elevator, and many feet of specially wrapped and protected pipes and electrical lines. Some of the electrical fixtures were explosion-proof. Over the years, rooms within rooms with thick cork insulation and specialized air-treatment equipment used in the manufacture of candy had been installed. The front of the building was faced with four to six-inch thick, highly decorative terra cotta facing in a gothic design laid in thick mortar and laced with lead spacers at the mortar joints. The record clearly shows that the facing of this building was highly decorative and difficult to reproduce. The record permits us to conclude that the facing was unique.

Subsequent to the filing of the declaration, attempts were made by the Condemnee to relocate his manufacturing and sales business. The Condemnee has two other retail sales stores located in the Erie area. The Condemnee was restricted in moving his business because of zoning restrictions of the City of Erie and because, in the business judgment of the Condemnee, the proffered sites were not adaptable. As a result of the condemnation proceedings, the Condemnee made alterations to one of his other retail sales stores and moved part of his machinery and equipment to the new location. The record indicates, however, that some of the equipment located in the condemned building could not be moved, either because of the size limitations of the new location or because it could not be removed from the building without damage.

Following the denial of certiorari to the United States Supreme Court, viewers were appointed, hearings were held, and the viewers issued an adjudication on January 14, 1972, awarding damages to the Condemnee in the amount of $150,000 with credit in the amount of $110,-300 which had been paid on account by the Condemnor on February 12, 1971. In addition, other damages were awarded for removal expense and business dislocation which are not the subject of this appeal. Subsequent to the viewers' adjudication, the Condemnor demolished the building and disposed of the machinery and equipment remaining therein to permit the construction of a new hotel as a part of its overall redevelopment plan. On February 1, 1972, the Condemnee filed an appeal with the court below. At the jury trial, the Condemnee testified that the fair market value of his property taken amounted to $550,000. His real estate appraisal expert testified that the Condemnee's building was unique and that the Condemnee's business, at the time of taking, was an assembled economic unit. This expert used the reproduction cost less depreciation method of valuation and stated that in his opinion the fair market value of all of

the property condemned (including an itemized list of 65 items of machinery and equipment and the unusual terra cotta facing) amounted to $340,000.

The expert testimony offered by the Condemnor included the following valuations:

1. $201,000 as replacement cost of the building only (using modern, commonly used materials), without any machinery, equipment or specialized facilities.

2. $220,950 as the replacement cost of the building alone.

3. $70,924 as the fair market value of the machinery and equipment including both that forming a part of the realty and that not forming a part of the realty.

4. $169,284 as the value of the land and building, machinery and equipment (using a comparative sales method of valuation and adding the machinery and equipment valuation set forth in no. 3, above).

5. $171,000 as the value of the land, building, machinery and equipment (using a comparative sales method of valuation and adding on the machinery and equipment valuation set forth in no. 3 above).[1]

All of the expert witnesses for both the Condemnor and Condemnee who gave their expert opinion on the fair market value of the entire condemned property utilized the valuations of other experts or reference material in fixing a valuation on the machinery, equipment, and terra cotta facing involved. In other words, none of the witnesses made his own individual valuation of all elements of the condemned property. The jury returned a verdict in favor of the Condemnee in the amount of $399,100. The Condemnor filed a motion for a new trial, which was denied by a court en banc. Hence this appeal.

The Condemnor presents five issues: 1. Where the land, building and all equipment thereon are owned by an individual and leased to a corporation, does the As-

---

1. Both parties also offered the testimony of contractors who were experts in terra cotta.

sembled Economic Unit Doctrine apply? 2. Where an operation of a Condemnee (such as the restaurant in this case) is terminated more than seven years prior to the filing of the declaration of taking, can damages be awarded for machinery and equipment used in such operation? 3. Did the court err in permitting the Condemnee to present evidence on a number of component parts of the condemned property, and place reproduction values on each to establish the reproduction value of the entire property taken? 4. Were the lower court's instructions adequate? 5. Was the verdict excessive?

Our scope of review is limited in an appeal from a denial of a motion for a new trial. The decision to grant or refuse a motion for a new trial is addressed to the discretion of the trial court based on the circumstances of the particular case and the court's action in granting or refusing such a motion will not be reversed in the absence of a manifest abuse of discretion or a clear error of law. *See Felix v. Baldwin-Whitehall School District,* 5 Pa. Commonwealth Ct. 183, 185, 289 A. 2d 788, 789 (1972).

The main issue involved in this case is whether or not the Assembled Economic Unit Doctrine is applicable. The Assembled Economic Unit Doctrine is an outgrowth, or expansion, of the Assembled Industrial Plant Doctrine which has long been recognized in Pennsylvania law,[2] but which has only recently been applied to eminent domoin proceedings.[3] Basically, the Assembled Industrial Plant Doctrine requires that machinery and equipment necessary for the operation of a plant and placed therein be considered fixtures, whether or not

---

2. *See Voorhis v. Freeman,* 2 W. & S. 116 (Pa. 1841); *Central Lith. Co. v. Eatmor Chocolate Co.,* 316 Pa. 300, 175 A. 697 (1934); *United Laundries, Inc. v. Board of Property Assessment,* 359 Pa. 195, 58 A. 2d 833 (1948).

3. *Gottus v. Allegheny County Redevelopment Authority,* 425 Pa. 584, 229 A. 2d 869 (1967).

they are attached to the realty. In *Singer v. Oil City Redevelopment Authority*, 437 Pa. 55, 261 A. 2d 594 (1970), the Supreme Court considered for the first time the applicability of the Assembled Industrial Plant Doctrine under the Eminent Domain Code of 1964 (Code), Act of June 22, 1964, Spec. Sess. P.L. 84, *as amended,* 26 P.S. §1-101 et seq. (Supp. 1974-1975).[4] In *Singer,* Justice EAGEN reviewed the provisions of the Code to determine if the Assembled Industrial Plant Doctrine should apply. He noted that section 602(a), 26 P.S. §1-602(a) (Supp. 1974-1975), defines just compensation in terms of "fair market value" and that section 603, 26 P.S. §1-603 (Supp. 1974-1975) includes the value of "[t]he machinery, equipment, and fixtures forming part of the real estate taken" as a factor to be considered in determining fair market value. The Code, however, offered no criteria for determining when machinery and equipment form part of the real estate taken and Justice EAGEN therefore concluded that the determination "is left to the courts as a matter of common law." Since the Assembled Industrial Plant Doctrine directly relates to determining when machinery and equipment form part of real estate, Justice EAGEN decided that principles of the doctrine are applicable under the Code.

In *Singer, supra,* the Supreme Court not only held that the doctrine is applicable under the Code, it also expanded the doctrine, insofar as it relates to eminent domain, to cover commercial, service and other economic units, as well as industrial plants. The Supreme Court called the expanded doctrine the Assembled Economic Unit Doctrine. When the doctrine is applicable to a case, equipment or machinery in a building will be treated as part of the real estate without regards to whether it is attached to the real estate. *The purpose of the doctrine is*

---

4. The taking involved in *Singer, supra,* occurred on December 7, 1964, and, therefore, the Supreme Court was considering the Code as it was prior to the existing amendments.

*to preserve the economic position of the individual whose property is condemned. See Singer, supra,* 437 Pa. at 64-65, 261 A. 2d at 599-600.

The Supreme Court stated in *Singer* that the Code provides "a complete legal scheme in the area of eminent domain." The Code provides compensation for the removal, transportation and reinstallation of all elements of a business except, of course, the land and building.[5] Thus, the Code attempts to limit the enforced sale to only the building and land on which the business is located, and, therefore, a condemnation becomes merely an enforced relocation of the business. The Assembled Economic Unit Doctrine is necessary when the business cannot be relocated as an intact economic unit. *See Singer, supra.* 437 Pa. at 60-65, 261 A.2d at 597-600.

In *Singer, supra,* Justice EAGEN set forth three examples which illustrate when the Assembled Economic Unit Doctrine should be applied and when it should not:

1. "In those instances where all or most of the machinery, equipment and fixtures of the economic unit are removable without significant injury to them, such that the economic unit is susceptible of continuance, as a comparable economic unit, in a new location, *only* those items of machinery, equipment and fixtures *not removable* from the condemned structure are to be considered a part of the realty taken by the condemnor. The economic position of the condemnee is preserved in this case, without the applicability of the Assembled Economic Unit Doctrine. . . ." (Emphasis in original.) 437 Pa. at 65-66, 261 A. 2d at 600.

---

5. The Code provisions quoted in *Singer, supra,* are applicable to the instant case because the taking occurred in 1968 before the Code was amended. The Act of December 29, 1971 P.L. —, No. 169, which substantially amended the Code, repealed sections 608-610 of the original Code, and in their place, added section 601A et seq., 26 P.S. §601A et seq.

2. "[W]hen such a portion of the assembled economic unit is not removable from the condemned property that which is so removable will not constitute a comparable economic unit in a new location, then *all* machinery, equipment and fixtures, whether loose or attached, which are vital to the economic unit and a permanent installation therein, will be considered a part of the realty under the Assembled Economic Unit Doctrine, so as to entitle the condemnee to compensation therefor under §§601, 602 and 603(3). To hold otherwise would leave condemnee only with scattered pieces of second-hand machinery, equipment and fixtures, most probably significantly depreciated in value when severed from the economic unit. Since the condemnee cannot maintain his economic position by moving to a new location, the statutory scheme will not grant him 'just compensation' without the applicability of the Assembled Economic Unit Doctrine." (Emphasis in original.) 437 Pa. at 66-67, 261 A. 2d at 600.

3. "Likewise, when the nature of the business requires a unique building for its operation, such that no other building within a reasonable distance is adaptable to the functioning of this business, then the condemned building, itself, will be considered an essential part of any meaningful economic unit in this industry. In this situation, even though all or most of the machinery, equipment and fixtures are removable, since no new site is available, condemnee cannot maintain his economic position by relocating. Therefore, *all* machinery, equipment and fixtures which are vital to the economic unit and a permanent installation therein will be considered a part of the real estate of the condemned property under the Assembled Economic Unit Doctrine. Only thus can the condemnee receive 'just compensation.'" (Emphasis in original.) 437 Pa. at 67, 261 A. 2d at 600-601.

This long quotation then sets forth the principles upon which the doctrine exists, and which will guide us in the determination of the main issue in this case.

We have carefully reviewed the quite lengthy record in this case, and we conclude that there is sufficient evidence in the record to support the jury's determination that the Assembled Economic Unit Doctrine is applicable. First of all, there is evidence to support a determination that the machinery and equipment which was removed from the building did not constitute a comparable economic unit in the new location. The record clearly indicates that many of the special features of the condemned building, including the rooms within rooms, the long cooling tunnel, and the custom-made built-in air treatment facilities, could not be removed. Secondly, the record also supports a determination that the condemned building was unique and that no other building within a reasonable distance was adaptable to the functioning of the business. This is true not only because of the many custom-made features within the building, but also because the applicable zoning law prevented the operation of the business in those buildings within a reasonable distance which might have been adaptable to the functioning of the business. *Cf. Redevelopment Authority v. Yee Kai Teung,* 5 Pa. Commonwealth Ct. 65, 289 A. 2d 498 (1972). The Condemnor, of course, argues that the Condemnee's economic unit was removable and that the condemned building was not unique.[6] While not controlling, we find it interesting to note that two of the Con-

---

6. *See* Dempsey, *The Assembled Economic Unit Doctrine: Good, Bad and Uncertain,* 42 Pa. B. A. Q. 64, 73 (1970), in which the author states: "The Singer decision will probably tempt condemnors back to the position that machinery, equipment and fixtures are always movable and are to be compensated for not at an 'inplace' value but on the basis only of the expenses of removal, transportation and re-installation. Nor will there be any unique buildings in the view of condemnors."

demnor's experts stated in unequivocal terms that the Condemnee's operation was an assembled economic unit. We conclude that the issue concerning the applicability of the doctrine was properly presented to and properly determined by the jury.

The Condemnor first argues that under the ruling of the Pennsylvania Supreme Court in the case of *Sams v. Redevelopment Authority*, 431 Pa. 240, 244 A. 2d 779 (1968), the Assembled Economic Unit Doctrine was not applicable in this case because there was a separate legal property interest between the owner of the property and equipment, and the operator of the business. We have carefully read the *Sams* opinion and conclude that it is inapposite, because that case was restricted specifically to section 605 of the Code, 26 P.S. §1-605 (Supp. 1974-1975), which sets forth a different doctrine known as the Doctrine of Unity of Use. Section 605 provides:

> "Where all or a part of several contiguous tracts owned by one owner is condemned or a part of several non-contiguous tracts owned by one owner which are used together for a unified purpose is condemned, damages shall be assessed as if such tracts were one parcel."

In *Sams,* one parcel was owned by the Condemnees as partners. The other parcel, which was situated across a public street and railroad tracks, was owned by a corporation (which was owned by the same partners). The Supreme Court in *Sams* set forth the principle that under section 605, there must be identical users as well as identical ownership. That principle, however, has no application in this case. Here, a single tract is involved and the owner of the land and the building is also the owner of the machinery and equipment. The family corporation, 99 percent of which was owned by the Condemnee, merely leased the property for business purposes. The corporation may have had rights under the Code as a tenant, but not as an owner. This problem may

explain why the initial pleadings in this case, including the declaration of taking, name only Pulakos. Later in the case, the corporate name was inserted in the caption by some undisclosed procedure, and later, upon the entry of the judgment, only the name of Pulakos was used, for only he was entitled to the damages still at issue.

The Condemnor next contends that some $30,000 worth of machinery and equipment applicable to the restaurant operation was improperly submitted to the jury because the restaurant operation had not been in existence from about 1962, and that under an opinion of this Court in *Sukala v. Redevelopment Authority*, 6 Pa. Commonwealth Ct. 601, 297 A. 2d 523 (1972), as a matter of law, the Assembled Economic Unit Doctrine should not be applied for such machinery and equipment. This contention is without merit for the reason that in *Sukala* no explanation was given concerning why the business there involved had not been operated for a period of six and one-half years. In this case, the Condemnee explained on the record that the reason he did not operate the restaurant was because the Condemnor advised him not to proceed with renovations already commenced, since the property was subject to eventual condemnation. The Condemnee even named the two officials of the Condemnor who made the recommendation to him. The Condemnor did not offer any evidence whatsoever to rebut this testimony, and the court properly permitted the jury to pass upon it. The jury apparently decided that the Condemnee had not abandoned his restaurant or soda fountain usage; and, considering the evidence in the record, we cannot state that such a determination was unwarranted.

The Condemnor argues that the trial court erred by allowing testimony concerning the reproduction cost of various component parts of the condemned property. It is true that the *unit rule* is still in effect in this Commonwealth to the extent that a jury is still required to

bring in one verdict for all of the property taken. However, that rule has been relaxed under the opinions of this Court. In *North Side Deposit Bank v. Urban Redevelopment Authority of Pittsburgh,* 1 Pa. Commonwealth Ct. 274, 274 A. 2d 215 (1971), we stated:

"Land and building experts are often not qualified to evaluate machinery and equipment. Machinery and equipment experts are often not qualified to evaluate land and buildings. Real estate appraisers often break down the value of a property into a value of the land and the value of the building for purposes of tax assessment. It seems unwarrantedly presumptuous for a court to dictate proper procedures to a profession when cross-examination is available to test the competence of the expert witness and the strength of his opinions. Real estate experts as well as courts realize that the values of the parts do not necessarily equal the value of the whole. As long as the ultimate opinions of such expert witnesses fix the difference between the value of the property as a whole before the taking and the value of the property as a whole after the taking, we can see nothing necessarily misleading about allocating certain values to the land, building, and machinery and equipment forming part of the real estate."

In this case the expert appraisal witnesses for both parties accepted and utilized the machinery and equipment appraisals of others. The only distinguishing feature of this case is the terra cotta front to this building; and concerning that feature we draw another distinction in applying the unit rule. In a case such as this where a part of the building is so unique that common sense dictates that a real estate appraiser would be forced to seek out expert advice and information to assist him in arriving at a proper unit valuation for the entire property condemned, it is entirely proper for such a witness to set forth in his testimony the basis upon which he

appraised that unique feature of the building. The terra cota facade of this building was so unusual that all of the witnesses, both for the Condemnor and the Condemnee, were forced to go beyond their own knowledge and experience to reach a proper valuation of the whole property taken. While there was some disagreement on valuation among these several expert appraisers, all were in agreement that the expert utilized by the Condemnee was experienced and trustworthy. The court below properly permitted the jury to consider the evidence presented which set forth this unique feature of this building as a separate item but as a part of the overall unit valuation of the entire property taken. The jury followed the instructions of the court and rendered a single verdict for all the property taken.

As noted above, the Condemnee's expert witness used the reproduction cost less depreciation method of valuation. *See* section 705(2)(iv) of the Code, 26 P.S. §705 (2)(iv) (Supp. 1974-1975). Condemnee's expert broke his testimony down into various components, including land, building, machinery, equipment, and the terra cotta facade. The sum of these components was $345,466, and the expert testified to a fair market value of $340,000. Condemnee's expert was well qualified, and our reading of his testimony permits us to conclude that it was not in any way improper. *See First Christian Church of Turtle Creek v. Redevelopment Authority of Allegheny County,* 15 Pa. Commonwealth Ct. 9, 324 A. 2d 821. (1974; *North Side Deposit Bank, supra.* The Condemnee himself testified in this case to a fair market value of $550,000. *See* section 704 of the Code, 26 P.S. §1-704 (Supp. 1974-1975). It is well settled, of course, that a condemnee may testify concerning valuation and the elements considered in arriving at his figure. *See Cohen v. Redevelopment Authority of the City of Philadelphia,* 12 Pa. Commonwealth Ct. 125, 315 A. 2d 372 (1974). We find nothing in the record to support Con-

demnor's contention that the trial court erred by permitting the Condemnee's testimony.

Condemnor also argues that the trial court's charge to the jury was inadequate and constituted fundamental error. In its charge to the jury the lower court used Justice EAGEN'S examples ( as set forth above) to explain the applicability of the Assembled Economic Unit Doctrine. We have carefully reviewed the lower court's charge and we conclude that it adequately instructed the jury as to the proper legal principles to apply to the case.

The Condemnor complains that the jury was not permitted to view the property because it had already been demolished, but we note that the Condemnor was the party who demolished the building, thereby prohibiting such view. The Condemnor also complains that the jury's verdict was excessive. Although the jury's verdict was significantly more than the viewers' award, it was also substantially less than the valuation placed upon his property by the Condemnee. It is true that the viewer's award is a factor to be considered when a new trial is requested, but it is not a controlling factor, absent other evidence that the verdict was excessive. *See Faith United Presbyterian Church v. Redevelopment Authority*, 7 Pa. Commonwealth Ct. 490, 298 A. 2d 614 (1972). In this type of case, it is the jury's function to judge the credibility and weight of the testimony. *See Kasych v. Department of Transportation*, 11 Pa. Commonwealth Ct. 621, 314 A. 2d 575 (1974). The jury properly carried out that function, and we do not find that their verdict is so contrary to the evidence as to shock one's sense of justice. *See Kasych, supra; Sheets v. Commonwealth,* 95 Dauph. 218 (1973), *aff'd. mem.,* 10 Pa. Commonwealth Ct. 212, 310 A. 2d 436. (1973).

In addition to what we have already said, the Condemnee presented a motion to quash based upon its reasoning that while the Condemnor took an appeal to this Court on November 23, 1973, and the writ of certiorari

was issued by the Prothonotary of this Court on that same date, the Condemnor did not lodge same with the Prothonotary of the Court of Common Pleas of Erie County until January 22, 1974. Condemnee contends that this was in violation of our Supreme Court's Rule No. 22. While the position of the Condemnee is understandable in view of the fact that he lost his appeal to the Pennsylvania Supreme Court, as noted hereinbefore, on the basis that he was one day late in filing his appeal, we note that the question in that case went to the jurisdiction of the Court to entertain the appeal. At the time the appeal was taken in this case, neither the rules of the Pennsylvania Supreme Court nor this Court provided direction regarding who was to file the writ with the Prothonotary of the court below and, therefore, there was some misunderstanding by counsel for the Condemnor. Counsel assumed that the writ would be sent by the Prothonotary of this Court to the Prothonotary of that court. His assumption, of course, was wrong. If the Condemnee could show some prejudice arising out of this delay, we would entertain his motion. However, no such prejudice or injury or damage was shown and, therefore, we will dismiss the motion to quash.

In summary, then, we hold that the court below properly permitted the jury to determine, as a part of its verdict, whether the condemned property was subject to the Assembled Economic Unit Doctrine, which the court adequately explained to the jury in its instructions. The court below neither abused its discretion nor committed an error of law. The jury's verdict was not so excessive as to shock the conscience of the court, and therefore we must affirm the order of the court below. In accordance with the above, we therefore

### ORDER

AND NOW, this 14th day of January, 1975, the Motion to Quash filed by Achilles C. Pulakos is hereby denied,

and the judgment entered in the court is hereby affirmed.

President Judge BOWMAN dissents.

DISSENTING OPINION BY JUDGE ROGERS:

I respectfully dissent.

The Eminent Domain Code of 1964, Act of June 22, 1964, Spec. Sess. P.L. 84, *as amended,* 26 P.S. §1-101 et seq. (Supp. 1974-1975) still declares just compensation to be the difference between the fair market value of the entire property interest immediately before and immediately after the condemnation.

While Section 705(2)(iv), 26 P.S. §1-705(2)(iv) permits a qualified valuation expert to testify as to his opinion of the value of the land together with the cost of replacing or reproducing the existing improvements thereon, less depreciation or obsolecence, and Section 705(1), 26 P.S. §1-705(1) permits such expert to state facts and data which he considered in arriving at his opinion, it does not pemit the qualified expert to break a building down into its construction components, and to compute total reproduction cost of the building by adding together the cost of the components. Here the condemnees' principal witness was permitted, over objection, to display to the jury in dollar amounts the following: (1) the depreciated value of what he described as the "base" building, an edifice which never existed; (2) the depreciated value of a terra cotta facing on the building; (3) the depreciated value of an elevator and dumb waiters; and (4) the depreciated value of the air conditioning and ventilating system in the building. To these he was permitted to add his values of land and of machinery and equipment and to display to the jury the total of all of these items — $345,466. The witness rounded his opinion of the fair market value of all property interests condemned to $340,000.

While it would be proper for the qualified expert to give his opinion, based on data obtained from builders, of the reproduction cost, less depreciation, of a building, it is in my opinion improper to permit the expert to deduce a building's total reproduction cost by adding up in the presence of the jury the depreciated cost of an assumed "base" building and particular items of embellishment thereto considered by the expert to be significant. It is proper, under the present Code, for the expert using reproduction costs less depreciation in the ascertainment of the value of improvements to testify as to the separate value of land, of improvements and, where such are involved, of machinery and equipment. In such a case it is, of course, proper for the expert to assign separate values to the individual items of machinery and equipment. However, the dollar value of particular areas of the condemned land or of minerals thereunder may not be separately stated. *Werner v. Commonwealth, Department of Highways*, 432 Pa. 280, 247 A.2d 444 (1968); *Thompson v. Commonwealth, Department of Highways*, 214 Pa. Superior Ct. 329, 257 A.2d 639 (1969). Nor is it, or should it be, acceptable to state the dollar value, in terms of reproduction cost less depreciation, of particular features of a building. We so concluded in *Tross v. Johnstown Redevelopment Authority*, 8 Pa. Commonwealth Ct. 605, 302 A.2d 883 (1973), where we upheld the action of a lower court excluding testimony as to the cost of the installation of a diner in the structure under consideration.

I would vacate the judgment and award a new trial.

Judge CRUMLISH, JR., joins in this dissent.